Madam Clerk, please call the first case in the morning. 316-0238 Great Plains Orthopedics v. Janet Snyder Your... Counsel, you may proceed. Good morning, Your Honors. Good morning, Counsel. May it please the Court, my name is Francis O'Byrne. I am from Roddy Law and I represent Great Plains Orthopedics. This is my appeal to the appellate court. Petitioner won the case at every level up until now and I appealed on a number of issues. At this point I would like to reserve five minutes. You will have five and reply. Thank you, Your Honor. I'm going to start out with notice. Notice has two categories. It has no notice and defective notice. And in this case, it's our position, my response position, that we're not dealing with defective notice. We're dealing with no notice. Our position is no notice is because we believe that the date of accident is as what Dr. Roddy stated, at the last date of accident. We're disputing accident, we're disputing all issues, but... Well then, so then, are you now admitting that your notice argument is hinged upon the manifestation date? Because you're... you don't agree with the Commission's manifestation date, do you? No, no. The Commission's manifestation date is November 10th of 09. Right. Petitioner picked 9-8-09. Dr. Roddy picked 9 of 08. And our position is Petitioner picked September of 08. She clearly stated that in what she told Dr. Roddy. Dr. Roddy's deposition, I mean, it couldn't have been any clearer. I mean, this was on direct examination, like the third page of the death. Dr. Roddy was asked about, you know, her injury or symptomology. He states that Petitioner's symptomology presented in September of 2008. She stated that she did not initially report her symptomology to her employer due to fear of losing her job. Counsel, what was the first date upon which the claimant sought medical treatment for her wrist and her hand, and the first date upon which she received a diagnosis for carpal tunnel syndrome? Do you know that date? Yes, I do. What is it? That would have been the first date, at least from the records I have, was Dr. Garst, September 8th, 08. No, it was November 10th, 2009. Oh, I'm sorry, the first treatment, the first date of diagnosis was November 10th. Yeah. Right, that's what he asked. Oh, yeah, I apologize. Yeah, the first date in which she went in, she received the diagnosis. That was the date she sought the first medical treatment. That was the date she got the diagnosis. So if that's the date that she got the diagnosis for the first time, why would it be an improper date for the commission to set as a manifestation date? The reason is all the appellate court cases. They don't talk about even the Durand case. The Supreme Court stated in Durand a formal diagnosis, of course, is not required. Durand states the manifestation date is not the date which an injury to its causal link became plainly apparent to a reasonable physician. Again, it's not. You're right, it says not required. It doesn't say it can't be the date. Oh, absolutely, Judge, absolutely. I completely agree with that. And there's lots of cases that say, you know, forget it. Even Durand says, no, no, no, we're not buying that. The person had symptoms a couple years before that. We're not buying it. When was the diagnosis? Our whole law notice in repetitive trauma is the date at which the claimant would have an understanding of the relationship between the condition and employment. Is that pretty much it? Yeah, I would agree. I would agree. And so you're saying that looking at this record, it's not November 10th? Yes, I believe that, absolutely. I believe that from the beginning. We at no time accepted this claim because we felt that first there was, you know, there was no work injury, and second is that based on the records that we have, she knew she had carpal tunnel. She was hiding it from our insurer. And there's case law that discusses it where, you know, there's prejudice. But that deals with defective notice. But the defective notice cases say, you know, if they know about, you know, if an injured worker knows about an injury and they don't tell us, then there's prejudice. Can I ask you a question? Yes. September 8th, 2009? Yes. She went to see a doctor, didn't she? Yes, she saw Dr. Garst. And who was Dr. Garst? Dr. Garst was... ...one of the partners of your employer. Yes. And so he may well have been a treating physician, but he is the one that told her to diagnose probable carpal tunnel syndrome. Are you suggesting that your employer didn't have notice that she had part, parts, excuse me, probable carpal tunnel syndrome on September 8th, 2009? He's one of their partners. Right. Well, I would, Judge, I agree that it's either September 8th... September 8th, 2009. Yeah. I would agree September 8th because even Dr. Pena says when he saw that, when he saw Petitioner, he reported that Dr. Garst told her on September 8th that she had probable carpal tunnel syndrome. So what's the problem with the notice? The notice is that the accident happened in 2008. That's when she moved on. When did a reasonable person know? She does this for a living. When was the first time anyone even told her she had probable carpal tunnel syndrome? September 8th, 2009. I would agree with that. Okay. And going to your argument, you're saying in 2008 that she should know because she does this for a living. What does she do for a living? She handles all of the inpatients, and according to her, she's like a superwoman. She handles 85 patients, you know, between 30 and 85 patients a day, which is mathematically impossible. Well, wait. But going back to your statement, does she have medical training? I'm not clear of anything. What is it that puts her in a position where she should know that she has carpal tunnel syndrome caused by her work activities? The medical opinion of Dr. Pena. No, but you said because of her position. Oh, because of her position. She knows about carpal tunnel. She knows about the causes of it, and Dr. Pena even quotes her when he says, in his report dated November 16th, he says, I indicated to the individual that a metabolic screening would be needed, and she stated, and he quotes, Oh, you need to check for disinformed individual. Wait. To check for platelet problems and other things, question mark. And he says she is certainly informed and not the disinformed individual she tries to make herself out to be. Wait a minute. Thyroid problems? Yeah. Well, thyroid problems is typically people that have a thyroid problem have more of a tendency to develop carpal tunnel. It doesn't mean that that's the issue. You could have an aggravation of a preexisting condition. It doesn't even matter. I mean, it could be obesity. It could be smoking. And this claimant was considered obese in one of the medical records. Yes. Okay, so. It was just one of the factors. The doctors looked at both of them. I mean, Dr. Rode gave a, you know, in his deposition. So by that statement about the acknowledging the thyroid, you're inferring that she has some medical knowledge sufficient to put her on notice of the carpal tunnel, but isn't it up to the commission to decide the inferences? Yes, it is. And even the Durant case, you know, addresses that. The legal question in Durant was whether the date chosen by the commission was against the manifest with the evidence. And what the Durant case said was, yeah, we think it was against the manifest with the evidence. Do you know the facts in Durant? You know the facts in Durant? Yes. That woman had been told, she had read an article, that the condition she had was probably employment-related. She disclosed when she read the article. The commission found that she was on notice that it was employment-related on that day. The Supreme Court in Durant turns around and says, the question of manifestation date is a question of fact for the commission to decide. And, oh, just because she read an article that said it was employment-related didn't mean that she was on notice, and then reversed the commission. The facts in Durant, my heavens, are worse than this. In this particular case, this woman testified that she told Duckworth that as a result of Garnt's diagnosis, she believed that her condition was related to her employment. There's no evidence to suggest anything other than your inferences that because she carries files around in the medical office, she knows what her condition is. Dr. Rohde, in his deposition, testified the manifestation date to be September of 2008. And the basis of that is that she knew that she had it, and she didn't want to tell her employer because she would get fired. She had actual knowledge that it was a work that she was doing. No, she had actual knowledge. She may have had some knowledge that she had symptoms of carpal tunnel. It was never diagnosed until September of 2008, when Ganass told her, or September of 2009, when Ganass told her she had probable carpal tunnel syndrome. It was never diagnosed prior to that date, was it? No, it wasn't. Well, then you're suggesting that because she carries files around in the medical office, she's on notice that, number one, she has carpal tunnel, and, number two, it's employment-related? That's your theory?  I don't think that's a very good theory. What's the basis for that? What's the basis of that opinion? Yeah. All the medical records. Well, no, no, no. How is it that a clerical worker in a medical office is somehow then imputed to have medical training or this knowledge sufficient to put her on notice as to the two elements that Justice Hoffman just identified? Well, I'm relying on the medical opinions of Dr. Rohde, because Dr. Rohde clearly stated that he feels that that's the manifestation date and that she knew that, I mean, again, because he told her she was afraid to report it because of fear of losing her job, which there was no evidence presented. Wait a minute. Because she's afraid to report her condition to her employer, because she's afraid of losing her job, how do you jump the gun and then say she knew it was employment-related? Because, well, if she... I understand what you're saying, and there is assumptions or inferences, but if you look at what the treating medical records state, and especially Dr. Pino, he clearly states she knew what she was talking about, and she was trying to get them to, you know, she was asking them to make it work-related. She was asking them. I mean, even Dr. Rohde even, you know, he thought it was horrible of what Dr. Pino said. I never see this in medical records. And when I look at treating medical records, I never see a doctor go after their patient, accusing them of, you know, exaggerating or trying to ask the doctor to write something that the doctor doesn't believe in. And this is not from Great Plains Orthopedics. This is from St. Francis Medical Center. So when I see that, it's a red flag. And then you go back and you look at, you know, all the other medical records, there isn't one doctor that says it's work-related. Not even Midwest Orthopedics, Dr. Mahoney. Nobody says it's work-related. Who says it's work-related? A couple years later, Dr. Blair Rohde. Okay, Dr. Blair Rohde says it's work-related. So he took his deposition. And in his deposition, he, you know, I mean, obviously I won't go through it, but one of the items that he said was, I asked a question. I said, if she lifted one file an hour, would that have been? And he said, no. He said, probably not. But he said, I'm not going to go into the 20 files. Well, the testimony was clear. She did not lift all these files and all these heavy files. In fact, I don't even understand how the arbitrator did not address the fact that she wasn't, not only was she not required to get the files, there were three people that were hired to do that. Can I ask you a question? Yes. Have you switched now from your notice argument to causation? I was about to ask the same question. You didn't tell us that you got off the notice issue. Oh, I'm sorry. No, I didn't. Well, the reason I'm addressing causation now is because it just ties in with, well, it all ties in together. But, you know, as far as, I mean, as long as they brought up causation, I'll bring it. The evidence is clear, is clear that she did not, I mean, they brought in a list of all the patients. It's mathematically impossible for all those patients. She's testifying that she had, you know, between 30 and 85 patients. If she had 85 patients, she would be there 16 hours a day. Can I ask you a question? Yes, Judge. Who's Dr. Rotman? Dr. Rotman is an IM doctor from St. Louis. Now, your theory is that this woman knew that she had carpal tunnel syndrome way back, long before the alleged manifestation date of 2009. Is that correct? Yes, Judge. Rotman said she didn't even have carpal tunnel syndrome. So how could she be on notice she has it when your own witness says she doesn't even have it? Our witness stated she did not have it based on the diagnostic studies. Then on his second exam, he reviewed updated diagnostic studies that he said she did have it. Now, you've got a doctor that can't even figure out if this woman has carpal tunnel syndrome. Your witness, not somebody else's, your witness can't even figure out she has carpal tunnel syndrome, and in the same breath you want to argue that she knew about it, that she had carpal tunnel all the way back into 2008.  Yes, it is. It's kind of like running with the hounds and hiding with the fox at the same time. You can't do it. You can't cherry pick your evidence. Now, we have disputed that, especially when she initially started treating, all the diagnostics came back negative. And then later on, they merged into a little bit more objective, and then she had the treatment. And then Dr. Rotman eventually changed his position. Well, if he couldn't figure it out, how did she figure it out? Well, she knew or should have known because she was afraid to tell her employer. But she has to know something. What is it that she knows or that she should have known, that she had carpal tunnel? In our position, yes. Well, then she's smarter than Dr. Rotman because he couldn't figure it out, even though he looked at her medical records. Well, that was based on the diagnostics. Now, based on subjective complaints, at the time that she saw Dr. Garst, he diagnosed her with probable carpal tunnel based on her subjective complaints without any diagnostics. All right, we're dancing around the issue. Causation is going to turn on. The commission, in fact, believed, gave greater weight to the opinion of Brody than Rotman. Correct? Yes. And they had reasons for doing that. They talked about Commissioner Brody explaining in great detail how the claimant's job duties were related to the mechanism of injuries, how static force necessary to grab the files increased, all sorts of technical things. And so they believed Brody over Rotman. So just tell us succinctly why they couldn't do that. They couldn't do that because Dr. Brody is the only doctor that establishes causation. And his opinion, if you believe Dr. Brody, in our argument, our position, is if you believe Dr. Brody, the manifestation date is September 2008. He's the only doctor that establishes causation and an accident date. He's the only one. So that's why it's clearly against the manifest way of the evidence because if you believe Dr. Brody, then you have to believe what he says. Wait a minute. You don't have to believe everything he says. Where do you get the idea that you can believe somebody on one issue? You've got to believe him on all. I never said that you had to believe him on all. Well, you're telling me if we believe him as to causation, we have to believe him as to manifestation. Where do the two follow? Why do they follow? Well, what evidence is there that you wouldn't? I mean, my argument would be there's no evidence to not follow Dr. Brody's opinion. Sure there is. There's Gnast. He says it shouldn't have existed for three years. No, Gnast turned around and said that was the date. Gnast records are the very first record that any doctor who saw her diagnosed as probable carpal tunnel. That's the very first day, September 2009. No doctor who saw her prior to that date diagnosed her with carpal tunnel, did they? No, I agree. So any doctor that's coming after that date is doing nothing but guessing. Gnast is not a guess. We've got his records. He diagnosed probable carpal tunnel September 2009. She turns around and she testifies and says, I never related my condition to employment until I saw Dr. Gnast in September. Now, the commission may very well be wrong by fixing the manifestation date as November, but it makes no difference because she notified Dr. Gnast in September, so she did notify her employer because he's a partner. So just because Brody turns around and says it's causally related doesn't mean that she was on notice prior to September. But if you look at all the treaty records, they all confirm her symptomology that goes back two, three years, and then she started taking medication for it according to the medical records. I think you misinterpret the requirement of knowing that you're injured and forgetting about the fact that you have to reasonably know it's employment related, and that's a factual question. A woman may very well have known that she was having difficulty with her arms, but in order to get it back into 2008, she would have had to have known or should have known that it was employment related. She denied that, and the commission chose the believer. You're past your time. You'll have five minutes to reply. Thank you. Thank you. Counsel, you have 15 minutes. May it please the Court. Counsel, my name is Jaime Israel from Strong Law Offices, and I represent the appellee Janet Snyder. Your Honor, Counsel touched upon in his brief and today in his argument a few different arguments. I think the counsel spent a lot of time on arguing the manifestation. As Your Honor noted, we initially filed the application for date of accident of September 8, 2009. That is when the date when she first went to see any doctor, and that being Dr. Garst, where she was diagnosed with probable carpal tunnel syndrome. The commission found that even though she was diagnosed with probable carpal tunnel on September 8, 2009, she was not diagnosed with definite carpal tunnel until November 10, 2009, and that's when they picked the date of manifestation. Commission is free to do that because pursuant to Durand, the date of manifestation is a question of fact. Commission is the fact finder, and commission picked that date because that was when the petitioner had the definite diagnosis. Counsel focused on Dr. Rodeo's opinion. The Dr. Rodeo opinion stated that the symptoms might have started sometime in September of 2008. Dr. Rodeo is not the fact finder. Dr. Rodeo is a medical doctor. He can offer an opinion, but commission still has to follow Durand and still has to find based on the facts that are presented at the time of the arbitration. So the committee, in essence, could have followed Rodeo's opinion, but they chose not to. Correct, Your Honor. But pursuant to Durand, because Dr. Rodeo, again, probably does never have read Durand, doesn't know what exactly Durand stands for, Dr. Rodeo gave an opinion medically as to what he might have thought that the day when the symptoms started. But Durand doesn't say the date of manifestation is when the symptoms start. Durand clearly states the date of manifestation is when the symptoms start and when the person reasonably believed. Okay, and there is something in the record, or is there not, that there is a family history of arthritis. And there was some testimony by your client that there was a question in your client's mind as to whether this is an arthritic condition. Correct, Your Honor. And I believe that was, Your Honor, based on when she saw Dr. Siddler, her primary care doctor. And Dr. Siddler did refer her to Dr. Miller, who was a rheumatologist. And when was that? That was after she saw Grapevine Orthopedic. That was, Your Honor, after the last visit with Dr. Garza, actually after OSF Occupational, when she went back to her primary care doctor. What date was that? The date, Your Honor, that she went to Dr. Miller, or he was referred to Dr. Miller was, and I don't have the exact date, Your Honor, but this was... Was it before or after September or November of 2009? Oh, it was certainly after, Your Honor. Oh, okay. It was after that. It was after she last saw OSF Occupational, which was November of 2009. Because she went back to her family care doctor and referred her to Dr. Siddler, then she came back to Dr. Miller, then she came back to Dr. Siddler, and then he referred her to Dr. Liefer and EMG, and then referred her to Dr. Mahoney. Counselor, your opponent seems to be hanging his hat on this topic, on the slender read of some conversations she had with a doctor earlier that indicated she might have some knowledge generally of medical conditions. What's your response to that, Erica? I think Your Honor, my response is, and Your Honor pointed that out, the only testimony regarding that is Dr. Rohde. Dr. Rohde did say that she was in fear of death. That's why she never reported it. Again, if your hands are not working, are you in fear of your job because you don't want them to fire because of poor performance, or are you in fear of your job because your condition is related to your job duties? I don't think counsel ever questioned my claim in that or regarding that during trial. The other thing counsel was also saying, well, you know, she should have known because she was asking Dr. Pena to make a diagnosis of carpal tunnel. Well, that's not what Dr. Pena's medical records state. Dr. Pena's medical records accurately, or not accurately, clearly states that petitioner was asking if it is work-related, asking someone if it's work-related or forcing someone to say it's work-related are two very different theories. Based on that, Your Honor, we do believe that the commission was correct in finding the manifestation date of November 10, 2009 because that is a question of fact for the commission to decide. At best, her statements were ambiguous. There's no way of hanging anything on her statements you're saying. They're ambiguous as to what her intent was in asking these questions, right? Not necessarily, Your Honor. I mean, are you referring to the intent with regards to why she didn't report it? No, I'm referring to her statement about, you know, knowing that, you know, whether or not she was in fear of losing her job. Her statements are ambiguous. You can't really read anything into those, can you, as to what her motivation was for asking the questions? She was never asked that question, Your Honor. I know, but you just get them saying that he was making the argument that she was in fear of her job. He interpreted it as having knowledge that she had carpal tunnel. I'm asking you, what is your opinion of those statements in general? They hold no weight, Your Honor. Right, they're ambiguous. They hold no weight. I think your position is, even if she was in fear of losing her job because she knew she had some difficulty with her arms, it doesn't necessarily mean she knew or should have known that it was employment-related. Correct, Your Honor. In which case, one of the elements for manifestation is absent. The argument on causation, I take it, is it's nothing more than a dispute between two doctors, Rockman and Rohde, and the Commission chose to believe Rohde and found causation and awarded her client benefits. Correct, Your Honor. And, Your Honor, with regards to notice, again, if you believe the date of manifestation, whether it be September or November, notice was there. One of the arguments that I would like to point out, Your Honor, which counsel never raised in his original appeal, he also argues, I believe it's his argument four, and he essentially says that the two-doctor rule was violated. The two-doctor rule was not violated. First of all, it was never raised on appeal in the court, and the two-doctor rule was not violated because post-rape and orthopedic, all the treatment the petitioner had was referred by Dr. Siddler, her primary care doctor. She was referred to Dr. Siddler, I'm sorry, from Dr. Siddler, to the EMG with Dr. Lee, to EMG with Dr. Truong, and then also to Dr. Mahoney and to Dr. Rohde, and the petitioner testified to all of those. The other thing, Your Honor, counsel raised in his argument, and I think that is certainly a very misplaced argument, his argument five regarding statute of limitation, and I would like to touch base on that. And counsel in his reply brief talks about a FAR, cited as FAR case, but I believe it's actually FARR, F-A-R-R-A-R case, and it talks about petition for a reinstatement, and he cites the commission rule 9020.90. The commission rule 9020.90 deals with petition for reinstatement, post of dismissal for lack of prosecution. In this present case, there is no dispute, and the record is pretty clear that at the time of the hearing, both cases were consolidated. The hearing took place on both the cases. After the hearing has already taken place, the arbitrator dismissed the earlier filing and issued a decision with regards to the later filing. But even if you say that, you know, with regards to the statute of limitation, even if the date of manifestation is 11-10-09 or September 8-09. That argument falls on necessity. Correct. It falls under the same argument as the notice, right? Correct, Your Honor. Okay. So, and one thing counsel also points, which I don't think we can touch base with that, Your Honor, because it was mentioned earlier during counsel's argument. Counsel, in his brief, says that there are medical records that goes back to 2006 and 2007. That is absolutely inaccurate, Your Honor. The first date of treatment that we have is September 8-09. And, Your Honor, I mean, briefly, for all the reasons mentioned, we request that you affirm the decision of the commission. Thank you, counsel. Your Honor. Counsel, you may reply. Briefly, just in response to counsel, she mentioned she brought up the medical bill issue. That was never weighed down. I don't know where counsel assumes that that was. All issues have been in dispute from the very beginning. The medical issue is, it's real clear. Dr. Rohde is the third doctor.  I don't think there's any other medical issue. I don't think there's any evidence in the record that says that that's not the case. She started treating with Great Plains Orthopedics. Dr.? Dr. Garst and Dr. Pina. And then she had diagnostic studies. And then she, on her own, went to Dr. Mahoney. And Dr. Mahoney was at Midwest, and that was a competitor of Great Plains. But they're allowed to do that. I think the evidence was pretty clear that she has free treatment at Great Plains Orthopedics for orthopedic issues in which she had received. Then she went to Midwest Orthopedics and had surgery with Dr. Mahoney. And then there was a period of time where she wasn't treating. And then she started treating with Dr.? I think it was Dr.? And Dr.? During the deposition of Dr. Rohde, he testified. Initially, he testified he wasn't sure how she got there. But then later on, on cross-examination or redirect, he did testify. It appears that I was referred by Dr.? So that's not as far as we're concerned. It's a non-issue. I think there's a chain. They've established that. But you've got Great Plains Orthopedics. Then you've got a break. You've got Midwest. And then you've got a break. And then you've got all the different treatments with Dr. Seidler, Dr. Rohde, and the number of doctors. So that's all I have on that issue. As far as on the issue of FARC, with filing applications, in my experience, what I've seen over the many years is what petitioners sometimes do is they file multiple applications. And what sometimes they're doing is they're arbitrage shopping. Sometimes what you have is you have a petitioner talking to three different attorneys, and they file three different apps. And what happens is that they often cheer and pick which app they want to keep and which one they don't. So a case like FARC clearly establishes the rules on that. Because otherwise, they could constantly? I mean, a petitioner that gets injured in Peoria, he could file three apps. And if he files them all at the same time, he can pick whatever arbitrage he wants. He can have that case dismissed. The commission rules don't allow that. The commission rules require that if your case is dismissed, you've got to reinstate it on the earlier filing. Because you get one date of accident. That date of accident was dismissed. Now, this case came out, the FARC case came out after we had tried the case. But I have been arguing this for many, many, many years. I think either there's some commission cases on it, but they weren't precedent. We've got FAR now. FAR is precedent. It is our position that if a case is dismissed in this earlier case, then you've got what FAR says is you've got a statute of limitations raised judicata issue. And I think it's clear on that. Because otherwise, then a petitioner can file multiple apps and then pick whatever one he wants. He can then just dismiss any case that he decides he doesn't want to deal with. And I've seen it happen, and they do it. They have a situation where they're not comfortable with the arbitrator or the situation, and they refer to another attorney. That other attorney doesn't file a substitution. What does he do? They file another app. And then they try to pursue the case with maybe another vendor or another arbitrator. What do we do? What we do is emotionally consolidate. We say, no, no, no, you've got to stay with this arbitrator. But that original app has to be allowed. And our position is by keeping it alive, then you don't have a statute of limitations raised judicata issue. If it gets dismissed, which is what happened in this case, then you've got the statute of limitations raised judicata issue. That's our position. In conclusion, we believe that the manifestation date was in 08. If your honors disagree with that, we would argue that the medical is clear that there are three providers, that Dr. Rohde is the third provider, and that we felt it's against the manifest way of the evidence that the arbitrator granted the medical bills from Dr. Rohde. And our third argument would be that we feel because that case was dismissed, it's a statute of limitations raised judicata. Thank you. Thank you, counsel, both, for your arguments in this matter. It will be taken under advisement and a written disposition shall issue.